UNITED STATES of America, Plaintiff–Appellee,

v.

John George SAHHAR, Defendant–Appellant.

No. 88–5413.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 31, 1990.

Decided Oct. 29, 1990.

---

Carlton F. Gunn, Deputy Federal Public Defender, Los Angeles, Cal., for defendant-appellant.

Thomas H. Bienert, Jr., Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before NELSON, BRUNETTI and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

Under 18 U.S.C. § 4246, an individual accused of federal crimes and found incompetent to stand trial may be committed indefinitely if his release would create a substantial risk of bodily injury to another or serious damage to property. We consider whether this statute violates the fifth and sixth amendment's guarantees of equal protection, due process and trial by jury.

I

On September 18, 1987, John George Sahhar was indicted under 18 U.S.C. § 871(a) for making a threat against the President of the United States. At the government's request, the district court held a competency hearing pursuant to 18 U.S.C. § 4241(a). The court found Sahhar incompetent to stand trial and ordered him committed to the custody of the Attorney General for evaluation and treatment in

accordance with section 4241(d). Findings & Order, Nov. 19, 1987.

The court held another competency hearing on July 29, 1988. Sahhar presented no evidence at the hearing. Dr. Donald R. Butts, the psychiatrist in charge of Sahhar's evaluation and treatment at the Medical Center for Federal Prisoners in Springfield, Missouri, submitted a report concluding that Sahhar was a paranoid schizophrenic. Dr. Butts also testified that Sahhar was "in a neurotic psychiatric state and ... uncooperative, incoherent and very bellicose and threatening." R.T. 7/29/88 at 19. According to Dr. Butts, Sahhar was "admitted to the most secure unit" at Springfield and placed "under very close observation ... for his own protection and for the protection of staff members." *Id.* at 14. In spite of these measures, Sahhar was verbally abusive to staff members, *id.* at 24–25, tore up his cell, *id.* at 21, and on at least one occasion had to be placed in restraints. *Id.* at 19. Dr. Butts concluded that Sahhar was not competent to stand trial and unlikely to become so within a reasonable period of time. The district court found Dr. Butts's testimony persuasive, *see id.* at 38–39, and recommitted Sahhar for further psychiatric evaluation.

Soon thereafter, the acting warden at the Federal Correctional Institution at Terminal Island, California filed a certificate requesting an involuntary commitment hearing pursuant to 18 U.S.C. § 4246(a). The court conducted a section 4246 hearing on October 13, 1988, at which the government submitted a report prepared by Dr. Jeanne Hetzel, Chief of Psychology Services at Terminal Island. Dr. Hetzel noted in her report that Sahhar was "overtly psychotic" and "hostile," and had "attempt[ed] to assault staff and other inmates." E.R. at 70. She concluded that Sahhar presented a substantial risk to others, and listed ten specific reasons for her conclusion, among them:

Sahhar's behavior appeared to be directed by aggressive and violent fantasies; he made no attempt to conform his behavior to acceptable norms; he had shown no guilt or acceptance of responsibility for his actions; he attempted to assault both staff and inmates; and there was no indication that he would comply with outpatient treatment. E.R. at 70–71.

Dr. Hetzel also testified at length about Sahhar's "aggressive behavior" while at Terminal Island, including numerous specific acts evincing his dangerousness. R.T. 11/13/88.[1] Like Dr. Butts, she concluded that Sahhar suffered from paranoid schizophrenia, and was more likely to act aggressively than unaffected persons. *Id.* at 58. Dr. Hetzel stated that Sahhar's refusal to take medication made treatment in a noncustodial setting infeasible. *Id.* at 19–22. While recognizing that some of Sahhar's behavior appeared "clinically exaggerated" and that his "bark seemed to be much worse than his bite," *id.* at 51–52, Dr. Hetzel found that defendant "presented a substantial risk to the safety of other people." *Id.* at 15.

Sahhar presented no expert testimony or reports. The only witness he called was his father, George Sahhar, who testified that defendant had never assaulted him and that he did not believe his son was dangerous. George Sahhar did admit, however, to calling the police on at least one occasion when his son became angry, *id.* at 68, 70–71, and testified about three incidents where his son became angry in his presence: when Sahhar tried to throw a refrigerator at his brother, when he dropped a whiskey bottle to the floor and kicked a telephone because his father would not give him money, and when he broke a window by throwing a cup through it because his father again would not give him money.

---

1. Specifically, Dr. Hetzel testified that Sahhar damaged facilities in his detention unit cell; he verbally threatened staff members while in the detention unit; he destroyed a cell in the in-patient psychiatric unit; he made verbal threats towards staff and inmates in the in-patient unit; and on one occasion he "made moves to assault [her] on the unit," approaching Dr. Hetzel from behind, placing his hands around her throat and squeezing. R.T. at 18. As to the last event, Dr. Hetzel admitted on cross-examination that she was able to break Sahhar's grip by turning around and confronting him. *Id.* at 53.

At the close of the hearing, the court found that Sahhar was suffering from a mental disease or defect and that his release would present a substantial risk of harm. The court then committed him to the Attorney General's custody for hospitalization and treatment in a suitable facility pursuant to 18 U.S.C. § 4246(d). The court further directed the Attorney General to seek a state placement for Sahhar and provide a report on his condition every six months. Sahhar currently is undergoing treatment at a state-operated facility in Arizona, but remains within the Attorney General's jurisdiction.

## II

Sahhar raises a number of constitutional challenges to his commitment under 18 U.S.C. § 4246: that it denies him equal protection by creating a different standard for commitment for those charged with federal crimes than for the general population; that it violates the fifth and sixth amendments by permitting commitment without a jury trial; and that it denies him due process by permitting commitment without specific findings that he had recently committed dangerous acts.[2] Before we address the merits of these challenges, we consider briefly the statutory scheme under which federal criminal defendants may be subject to involuntary commitment.

The treatment of mentally incompetent federal criminal defendants is governed by 18 U.S.C. §§ 4241–4247. Of particular concern here are sections 4241 and 4246, providing for the treatment of persons found incompetent to stand trial. Section 4241(a) provides that whenever the court has reasonable cause to believe a defendant is suffering from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court may conduct a hearing to determine the defendant's competency.

If the court finds by a preponderance of the evidence that the defendant is incompetent, it shall commit him to the custody of the Attorney General for treatment. 18 U.S.C. § 4241(d). The defendant may be hospitalized for a reasonable time, generally not to exceed four months, "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed." 18 U.S.C. § 4241(d)(1). If at the end of this period the court determines that defendant's mental condition has not improved sufficiently for trial to proceed, the defendant becomes subject to the provisions of section 4246. 18 U.S.C. § 4241(d).

Section 4246(a) authorizes the director of the facility in which the defendant is hospitalized to certify that (1) the defendant is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another" and (2) "suitable arrangements for State custody and care of the person are not available." Upon the filing of such a certificate, the court holds a hearing to determine whether the person is dangerous as alleged. If the court finds by clear and convincing evidence that defendant's condition satisfies the section 4246(a) criteria, it shall commit the defendant to the custody of the Attorney General pursuant to section 4246(d) until such time as (1) he no longer poses a substantial risk of harm or (2) a state assumes control over his treatment.

## III

■ Sahhar first contends that 18 U.S.C. § 4246 denies him equal protection by creating an impermissible distinction between different persons who could be classified as dangerous and mentally ill: those who have been charged with federal crimes and those who have not.[3] Dangerous, mentally

2. Sahhar also contends that the government was required to show that he posed an "imminent" threat of danger. However, because Sahhar did not raise this issue below, and because the record contains substantial evidence of his dangerousness, we decline to consider it here. *See*

*United States v. Hayden,* 860 F.2d 1483, 1485 (9th Cir.1988).

3. Although the fifth amendment does not contain an equal protection clause, as does the fourteenth amendment, the federal government

ill persons not charged with violating federal law are not subject to the provisions of section 4246 or any other federal commitment statute, although many states provide for their commitment. On the other hand, dangerous, mentally ill persons charged with federal crimes face the possibility of indefinite commitment.

A. Although the Supreme Court has on a number of occasions considered the constitutionality of involuntary commitment statutes, see, e.g., Jones v. United States, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983); Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), it has never precisely indicated the standard of review it has exercised in reaching its decisions.[4] In Jones, the Court indicated in dicta that the traditional rational basis test applies to involuntary commitment classifications, see 463 U.S. at 362 n. 10, 103 S.Ct. at 3048–49 n. 10, requiring only that the classification be rationally related to a legitimate government interest. See New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).[5] Defendant contends, however, that because "commitment for any purpose constitutes a significant deprivation of liberty," Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979), we should review the classification created in section 4246 under a heightened scrutiny standard of review, similar to that used for classifications based on gender. See Craig v. Boren, 429 U.S. 190, 210–11 n. *, 97 S.Ct. 451, 463–64 n. * (1976) (Powell, J., concurring); Associated Gen. Contractors, Inc. v. City & County of San Francisco, 813 F.2d 922, 940 (9th Cir.1987), petition dismissed, —

U.S. ——, 110 S.Ct. 296, 107 L.Ed.2d 276 (1989). Under the heightened scrutiny test, a classification must be substantially related to the achievement of an important governmental interest. See Craig, 429 U.S. at 197, 97 S.Ct. at 456. We need not resolve the standard of review issue, however, as the result in this case would be the same under either standard.

B. The government's interest in protecting society from those charged with crimes is both "legitimate and compelling." United States v. Salerno, 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Thus, "[e]ven competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system," id., and the government routinely may classify persons on the basis of their status as criminal defendants. Persons charged with crimes may be subject to arrest, detention and interrogation; they may be searched, photographed, fingerprinted and, if found to be dangerous or a flight risk, held without bail. See id. at 751–52, 107 S.Ct. at 2103–04. And, of course, only criminal defendants face the distinct possibility of conviction and jail time. Here, for example, Sahhar faced up to five years in a federal institution and a substantial fine if convicted. See 18 U.S.C. § 871(a) (1988).

Sahhar contends, however, that while Congress may have broad authority over criminal defendants, it may not establish procedures that make it easier to commit those charged with crimes than to commit members of the general population. For this proposition, Sahhar relies primarily on Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), and Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32

must nevertheless provide persons with "equal protection of the laws." See Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

**4.** Modern equal protection analysis involves at least three possible standards of review: strict scrutiny, heightened scrutiny and rational basis. We are concerned here with only the latter two, as it is clear that strict scrutiny does not apply to involuntary commitment classifications. See Hickey v. Morris, 722 F.2d 543, 545–46 (9th Cir. 1983) (citing Jackson v. Indiana, 406 U.S. 715,

92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966)).

**5.** The rational basis test is, more or less, a judicial rubber stamp. Courts have almost always upheld classifications evaluated under this standard. But see, City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (striking down as irrational the denial of a special use permit to a group home for the mentally retarded).

L.Ed.2d 435 (1972), both involving state involuntary commitment procedures for dangerous persons charged or convicted of crimes.

In *Baxstrom*, the Court invalidated as a denial of equal protection a New York statute that permitted involuntary commitment at the expiration of a prison sentence without a finding of dangerousness or jury review as required for all other civil commitments in New York. 383 U.S. at 110, 86 S.Ct. at 762. The Court rejected the state's contention that the existence of a prior conviction—supposedly proving "criminal tendencies"—was a sufficient basis for affording an individual fewer procedural protections prior to commitment:

> Where the State has provided for a judicial proceeding to determine the dangerous propensities of all others civilly committed to an institution of the Department of Correction, it may not deny this right to a person ... solely on the ground that he was nearing the expiration of a prison term.... All others receive a judicial hearing on this issue. Equal protection demands that Baxstrom receive the same.

*Id.* at 114–15, 86 S.Ct. at 764.

Even more on point is *Jackson,* which held that an Indiana statute providing for the commitment of incompetent criminal defendants denied petitioner equal protection because it imposed more lenient standards for commitment and more stringent standards for release than imposed by the state's general civil commitment procedures. 406 U.S. at 730, 92 S.Ct. at 1854. The Court was particularly concerned that the statute did not require a finding of mental illness or feeblemindedness—required for ordinary civil commitments in Indiana—but merely that a defendant was incompetent to stand trial. *Id.* at 727, 92 S.Ct. at 1852. The Court also found that, under Indiana's general civil commitment statute, petitioner probably would have been eligible for release in his present condition, but was not so as an incompetent criminal defendant. *Id.* at 729, 92 S.Ct. at 1853. Rather, on the facts of that case, it appeared that petitioner faced the distinct possibility of permanent institutionalization. *Id.* at 725–26, 730, 92 S.Ct. at 1851–52, 1854.

*Jackson* and *Baxstrom* do provide some support for Sahhar's position. As did the statutory scheme in *Jackson,* section 4246 distinguishes among individuals solely on the basis of their status as charged criminal defendants. And, as did the State of New York in *Baxstrom,* the government here seeks to justify the distinction by arguing that those affected by section 4246 are already subject to criminal proceedings and, thus, may present a greater risk to society. Nonetheless, *Jackson* and *Baxstrom* are not dispositive; other cases teach that not every disparity between commitment procedures applicable to individuals accused of crimes and those applicable to the general population amounts to a denial of equal protection. *See Jones v. United States,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983); *Houghton v. South,* 743 F.2d 1438 (9th Cir.1984); *Hickey v. Morris,* 722 F.2d 543 (9th Cir.1983).

In *Houghton,* we upheld a Montana statute that, as with the one at issue here and in *Jackson,* applied different standards for the commitment of criminal defendants found incompetent to stand trial than for the general population. 743 F.2d at 1439–40. In contrast to *Jackson,* the committing court in *Houghton* made a specific finding of dangerousness. *Id.* at 1440. There also existed a means by which the committed person could obtain his release similar to the means available for other civilly committed persons in Montana. *Id.* Thus, we concluded that the differences between the two procedures were not significant enough to constitute an equal protection violation.

Similarly, *Jones v. United States* considered equal protection and due process challenges to the District of Columbia's automatic commitment procedures for criminal defendants found not guilty by reason of insanity. The Court upheld the procedures, even though insanity acquittees had no right to a jury finding of dangerousness. 463 U.S. at 362–63 n. 10, 103 S.Ct. at 3048–49 n. 10. Although the Dis-

trict provided a jury trial in all other civil commitment hearings, the absence of a specific jury determination of dangerousness was "justified by the fact that the acquittee has had a right to a jury determination of his sanity at the time of the offense." *Id.* (internal quotations omitted). Because the classification was sufficiently related to the government's "strong interest in avoiding the need to conduct a *de novo* commitment hearing following every insanity acquittal," it was upheld. *Id.* at 366, 103 S.Ct. at 3050; *see also Hickey,* 722 F.2d at 546–48 (rejecting similar equal protection challenge to Washington commitment statute for insanity acquittees).

■ Here, we find the classification created by section 4246 to be substantially related to important federal concerns. In addition to Congress's well-established interest in protecting society from dangerous criminal defendants, *Salerno,* 481 U.S. at 749, 107 S.Ct. at 2102, section 4246 squarely addresses a unique federal concern—the control and treatment of dangerous persons within the federal criminal justice system who are incompetent to stand trial. Unlike most states, the federal government has chosen not to establish a comprehensive system of civil commitment, reserving to local authorities the principal task of committing dangerous, mentally ill persons. *See United States v. Clark,* 617 F.2d 180, 184 n. 5 (9th Cir.1980) ("The passage of [section 4246] was not intended to be an invasion of the general field of lunacy, which is reserved to the states."); E. Beis, *Mental Health and the Law,* 112–39 (1984) (describing various state commitment procedures). Section 4246 thus is narrowly tailored to apply only to a particu-

lar concern of the federal government: dangerous persons charged with federal crimes but found incompetent to stand trial. *See Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956).

Congress has a substantial interest in enacting legislation targeting those accused of federal crimes, just as it has a substantial interest in enacting legislation addressing other unique federal interests. *See, e.g., United States v. Antelope,* 430 U.S. 641, 647–50, 97 S.Ct. 1395, 1399–1400, 51 L.Ed.2d 701 (1977) (statute applying only to crimes committed on Indian reservations does not deny equal protection, even though punishment differs from that imposed by states in which reservations are located); *United States v. Cohen,* 733 F.2d 128 (D.C.Cir.1984) (en banc) (statute providing for commitment of federal insanity acquittees does not deny equal protection even though it applies only in the District of Columbia). By choosing to regulate individuals such as Sahhar, whose conduct implicates substantial federal concerns, Congress is not required to create a national system of commitment for all mentally ill individuals who might present a danger to society. To hold otherwise would burden too heavily the federal government's compelling interest in administering its criminal justice system, and would precipitate a massive federal intrusion into a field that has generally belonged to the states.

Moreover, the criteria and procedures under which defendants are committed pursuant to section 4246 are not dissimilar to those employed by many states for general civil commitment,[6] and do much to ensure

---

6. As with the federal government's indefinite commitment procedures, most states provide for a prehearing examination of the person to be committed, *see, e.g.,* Ariz.Rev.Stat.Ann. § 36–521 (Supp.1989); Ill.Rev.Stat. ch. 91½ ¶ 3–702(a) & (b) (1987); New York Mental Hygiene Law § 9.27(a) (1989); Texas Rev.Civ.Stat. art. 5547–33 (1987). Further, they guarantee the right to retained or appointed counsel, *see, e.g.,* Ill.Rev.Stat. ch. 91½ ¶ 3–805 (1987); Or. Rev.Stat. § 426.100 (1989); Texas Rev.Civ.Stat. art. 5547–37 (1987), the right to testify, *see, e.g.,* Idaho Rev.Stat. § 66–329(j) (1989), and the right to cross-examine and subpoena witnesses, *see,*

*e.g.,* Idaho Rev.Stat. § 66–329(j) (1989); Or.Rev. Stat. §§ 426.090, 426.095(3) (1989), as do the federal procedures at issue here.

We recognize however that, unlike federal commitment procedures, commitment procedures in the majority of states also include a right to a jury trial. E. Beis, *Mental Health and the Law* 120 (1984). We hold today, however, that an individual does not have a *constitutional* right to a jury trial in a civil commitment proceeding, *see* pages 1204–1207 *infra.* Because section 4246's commitment procedures are well-tailored to achieve the government's important interest of committing dangerous federal crimi-

the fairness and accuracy of the commitment process. Federal commitment procedures provide for a short-term period of treatment and evaluation, followed by a full evidentiary hearing before a neutral magistrate. At the hearing, the alleged incompetent is entitled to his own attorney and, if he cannot afford one, appointed counsel. 18 U.S.C. § 4247(d). He may testify, present evidence, subpoena witnesses on his own behalf and confront and cross-examine witnesses who appear at the hearing. *Id.* Section 4246 permits civil commitment only if the court finds by clear and convincing evidence that the person suffers from a mental disease or defect and thus poses a substantial risk of bodily injury to another or serious property damage. 18 U.S.C. § 4246(d). And, of course, a defendant is not subject to section 4246's provisions at all unless the government has sufficient grounds to prosecute for a criminal act and the director of the facility at which the defendant is being treated certifies that the defendant poses a substantial risk to society as a result of his condition. 18 U.S.C. §§ 4241(a), 4246(e).[7] General civil commitment proceedings typically impose no such procedural hurdles prior to an involuntary commitment hearing.

The Attorney General is required to place the committed individual in a facility suitable to provide care or treatment given the nature of the charged offense and the condition of the defendant, 18 U.S.C. §§ 4246(d), 4247(a)(2), and must "make all reasonable efforts" to cause a state to assume responsibility for the committed person. 18 U.S.C. § 4246(d). The statute also provides for mandatory, periodic review of the commitment decision. It states that the director of a hospital facility

> *shall* prepare annual reports concerning the mental condition of the [committed] person and containing recommendations

concerning the need for his continued hospitalization. The reports *shall* be submitted to the court that ordered the person's commitment to the facility and copies of the reports *shall* be submitted to such other persons as the court may direct.

18 U.S.C. § 4247(e)(1)(B) (emphasis added). The director is also under a statutory obligation promptly to request the court to release the committed person if the director determines that the person is no longer dangerous. 18 U.S.C. § 4246(e). Further, a committed person's counsel or legal guardian may, at any time except within 180 days of the commitment determination, file a motion with the court requesting a hearing to determine whether the person should be discharged. 18 U.S.C. § 4247(h). The dissent's assertion that "there is no provision for automatic, periodic review of the commitment decision," dissent at 1209 n. 4, flies in the face of these provisions.

Without question, commitment under section 4246 is a significant infringement on the liberty interests of a person who has merely been charged, and not convicted, of criminal activity. Yet, the federal government's decision not to subject the general population to these procedures does not amount to a violation of equal protection where, as here, the government's interests are substantial and the procedures are tailored to serve those interests.

## IV

Sahhar next challenges the constitutionality of section 4246 because it fails to provide for a jury trial to determine eligibility for commitment.[8] He makes a two-pronged argument: First, that the commitment proceedings under section 4246 are "squarely in the routine of the criminal process," Appellant's Opening Brief at 28,

---

nal defendants, we reject Sahhar's contention that the lack of a jury trial renders the procedural protections here deficient.

7. While this latter factor was not sufficient to carry the day in *Jackson* and *Baxstrom*, we believe that it adds a significant safeguard in light of the other procedural and substantive protections provided by the scheme here.

8. Sahhar contends that section 4246 "violates the [fifth amendment's] Due Process Clause by failing to provide for a jury trial." Appellant's Brief at 26. In fact, much of Sahhar's argument is based upon cases decided under the sixth amendment, not the fifth. Consequently, we treat his claim as one alleging a violation of both the fifth and sixth amendments.

and thus require all the procedural protections of criminal proceedings; second, that even if the challenged commitment proceedings are purely civil in nature, due process requires that they be conducted before a jury.

A. The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." Sahhar argues that since section 4246 proceedings are ancillary to a criminal prosecution, they are penal in nature and, therefore, his right to a jury trial prior to commitment approximates that of a criminal defendant. In short, he claims that his commitment proceeding was nothing more than a "direct substitute" for criminal prosecution. Thus, Sahhar contends that, as in a criminal trial, he was entitled to have a lay jury weigh the evidence and decide whether the facts of his case warranted involuntary commitment.

Sahhar's argument is foreclosed by the Supreme Court's decisions in *Allen v. Illinois*, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), and *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).[9] *Allen* considered whether the fifth amendment's guarantee against compulsory self-incrimination applies to commitment proceedings under Illinois's Sexually Dangerous Persons Act. The Court held it does not, as the commitment proceedings were regulatory, not criminal in nature, even though they could not be brought unless criminal charges had been filed. 478 U.S. at 370, 106 S.Ct. at 2992. The Court further held that simply because the state provides some of the safeguards applicable in criminal proceedings—rights to counsel, to a jury trial and to confront and cross-examine witnesses, and the requirement that dangerousness be proved beyond a reasonable doubt—does not turn the proceedings into a criminal trial requiring the full panoply of rights

applicable there. *Id.* at 371–72, 106 S.Ct. at 2993. Finally, that a person adjudged dangerous is committed to a maximum-security institution that also houses convicts needing psychiatric care does not make the confinement "punishment;" nor does it render "criminal" the proceedings that led to it. *Id.* at 372–74, 106 S.Ct. at 2993–95.

Likewise, *Salerno* rejected a substantive due process challenge to provisions in the Bail Reform Act of 1984 permitting the pre-trial detention of dangerous individuals charged with certain specified offenses. The Court relied heavily on the fact that the statute advances important regulatory, rather than penal, interests. 481 U.S. at 746–48, 107 S.Ct. at 2100–02. Where Congress's purpose in enacting a statutory scheme is to regulate, rather than to punish, the courts must treat it as such, so long as the scheme "may rationally be connected" to the regulatory purpose assigned it and is not "excessive in relation to [that] purpose." *Id.* at 747, 107 S.Ct. at 2101 (internal quotations omitted). "[T]he mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *Id.* at 746, 107 S.Ct. at 2101.

■ We see no meaningful distinction between this case and *Allen* and *Salerno*. As with the detention procedures the Supreme Court considered in those cases, section 4246 protects society by placing into the government's custody certain dangerous individuals. Section 4246 is not intended to address past wrongs, but rather to reduce the risk of future harm to persons and property. *See United States v. Curry*, 410 F.2d 1372, 1374 (4th Cir.1969); *see also Addington*, 441 U.S. at 428, 99 S.Ct. at 1810 ("[i]n a civil commitment state power is not exercised in a punitive sense"). As soon as the committed individual can demonstrate that he is no longer dangerous, he is entitled to be released. Thus, federal commitment serves a regulatory, rather

9. Sahhar might at one time have found some support in a few district court decisions. *See, e.g., Suzuki v. Quisenberry*, 411 F.Supp. 1113, 1128 (D.Haw.1976) ("[i]f civil commitment for mental illness is used as a method of detaining persons who might otherwise be charged with criminal conduct, the argument for the right for a jury trial becomes stronger"). We believe, however, that the Supreme Court's more recent decisions in *Allen* and *Salerno* supersede any persuasive authority these cases might have provided.

than punitive, purpose and section 4246 need not incorporate the right to a jury trial. *See Commonwealth v. Barboza,* 387 Mass. 105, 438 N.E.2d 1064, *cert. denied,* 459 U.S. 1020, 103 S.Ct. 385, 74 L.Ed.2d 516 (1982) (holding that the sixth amendment jury right does not apply to civil commitments).[10]

■ B. Because the sixth amendment is inapplicable here, we turn to Sahhar's contention that the fifth amendment's due process clause guarantees the right to a jury trial in civil commitment proceedings. In determining whether due process requires a particular procedure, a court must weigh "the liberty interest of the individual" against the government's "legitimate interests" in confinement, "including the fiscal and administrative burdens additional procedures would entail." *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982). This test, referred to in this circuit as "the fundamental fairness requirement," is set forth adeptly in *Tyars v. Finner,* 709 F.2d 1274 (9th Cir.1983):

> In weighing the liberty interest of the individual against the legitimate interests and purposes of the state in the civil commitment process, it is vital that, as a matter of constitutional due process, we impose those restrictions that are "imperative to assure the proceedings' fundamental fairness." However, we must also strive to "preserve, so far as possible, the essential elements of the State's purpose," and that we measure the requirements of due process with a sensitive awareness of the need to "permit the orderly selection of any additional protections which may ultimately prove necessary."

*Id.* at 1283 (quoting *In re Gault,* 387 U.S. 1, 72, 87 S.Ct. 1428, 1467, 18 L.Ed.2d 527 (1967)).

■ Although involuntary "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," *Addington,* 441 U.S. at 425, 99 S.Ct. at 1809, the procedures required for a civil commitment are not nearly as rigorous as those for criminal trials, *id.* at 432–33, 99 S.Ct. at 1812–13, or even juvenile proceedings. For example, courts have held that the fifth amendment's protection against self-incrimination does not apply to civil commitment proceedings, *Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (commitment of sexual deviants), that a state need only show dangerousness by "clear and convincing" evidence, *Addington,* 441 U.S. at 431–33, 99 S.Ct. at 1812–13, and that an attorney or guardian ad litem need not be appointed to represent an alleged incompetent at a commitment hearing. *Rud v. Dahl,* 578 F.2d 674, 678–79 (7th Cir.1978); *but see, Heryford v. Parker,* 396 F.2d 393, 396 (10th Cir.1968) (holding that such appointment is required). No federal appellate court, however, has considered whether due process gives an alleged incompetent the right to have a jury decide the factual issues in his commitment proceedings, although a number of district courts have held that no such right exists. *See French v. Blackburn,* 428 F.Supp. 1351, 1361 n. 19 (M.D.N.C.1977), *aff'd mem.,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979); *Suzuki v. Quisenberry,* 411 F.Supp. 1113, 1128 (D.Haw.1976); *Doremus v. Farrell,* 407 F.Supp. 509, 516 (D.Neb.1975); *but cf. Lynch v. Baxley,* 386 F.Supp. 378, 394 (M.D.Ala.1974) ("although there may be no such constitutional right,

---

**10.** The dissent agrees that Sahhar has no right to a jury trial under the sixth amendment, but concludes that he does have a right to a jury trial under the equal protection component of the fifth amendment. Surely this cannot be. If the sixth amendment itself draws a distinction between criminal defendants who are dangerous due to mental disease and those who are not, the legislature cannot be violating equal protection by making precisely the same distinc-

tion in deciding whether to grant a right to a jury. The dissent is in the awkward position of maintaining that the sixth amendment makes a distinction which is invidious under the standards of the fifth. This line of analysis has never been suggested by the Supreme Court even as a remote possibility nor, to our knowledge, by anyone else, not even the defendant here.

we believe in most, if not all, instances a jury is desirable").

Those district court decisions that have found no due process right to a jury trial in civil commitment proceedings have generally relied on *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), in which the Supreme Court held that there was no right to a jury trial in a juvenile delinquency proceeding. *See Suzuki*, 411 F.Supp. at 1128; *Doremus*, 407 F.Supp. at 516; *Lynch*, 386 F.Supp. at 394. *McKeiver* held that trial by jury is neither a necessary element of the fundamental fairness guaranteed by the due process clause, nor an essential component of accurate factfinding, 403 U.S. at 543, 91 S.Ct. at 1985. The Court cited as examples equity cases, military trials, workmen's compensation, probate and deportation cases, all of which satisfy the requirements of due process even in the absence of a jury. Thus, it could not be said " 'that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would by a jury.' " *Id.* (quoting *Duncan v. Louisiana*, 391 U.S. 145, 158, 88 S.Ct. 1444, 1452, 20 L.Ed.2d 491 (1968)).

We similarly believe that any additional procedural fairness ensured by a jury trial is outweighed by the substantial burden a jury would impose on the commitment process. Like juvenile proceedings, section 4246 hearings are relatively informal and discrete, and they do not suffer from the complications and delays often associated with jury trials. The factfinding procedures employed, including the four-month period of pre-commitment observation, facilitate careful evaluation of the individual's mental health and dangerousness. Other than "introducing into the process a lay judgment," Appellant's Opening Brief at 29 (internal quotations omitted), defendant has given no tangible reasons why a jury trial would make the commitment process more reliable or just. Because section 4246 hearings often involve difficult medical issues, lay judgment may be of little or no assistance to the factfinding process. Thus, we conclude that due process does

not require a jury trial in a section 4246 proceeding.

V

Sahhar finally claims he was denied due process because the government failed to produce sufficient evidence to justify his commitment. Consistent with the requirements of due process, section 4246 requires the government to prove by clear and convincing evidence that an incompetent defendant presents a substantial risk of bodily injury or serious property damage. Sahhar contends, however, that due process and section 4246 also require the government to prove that he had recently committed overt acts evincing his dangerousness.

A. Section 4246 provides little guidance as to how the government must prove that the person to be committed poses a substantial risk of causing bodily injury or serious property damage. In *Phelps v. United States*, 831 F.2d 897 (9th Cir.1987), we held that the words "substantial" and "serious," as used in federal commitment statutes, "cannot be quantified." *Id.* at 898 (construing broadly identical "substantial risk" language in 18 U.S.C. §§ 4243 and 4247, which govern the commitment of those found not guilty by reason of insanity). Rather, the substantial risk requirement "guides the judge who must make the commitment decision," and creates essentially the same standard for federal involuntary commitment as used in many state procedures. *See id.* Thus, we believe that a finding of "substantial risk" under section 4246 may be based on *any* activity that evinces a genuine possibility of future harm to persons or property. *See Jones v. United States*, 463 U.S. at 364–65, 103 S.Ct. at 3049–50 (nonviolent crime against property sufficient to establish dangerousness). Whether that activity occurred recently is but one factor for the district court to consider in weighing the evidence.

Nor do we believe that due process requires a finding that defendant recently committed dangerous acts. In establishing the clear and convincing evidence standard for civil commitments, *Addington* held that commitment must be based on "something

more serious than is demonstrated by idiosyncratic behavior." 441 U.S. at 427, 99 S.Ct. at 1810. Otherwise, *Addington* placed no due process limits on the range of evidence a court may consider in reaching its decision. So long as the government can "justify confinement by proof more substantial than a mere preponderance of the evidence," it may satisfy the requirements of due process. *Id.* Applying this standard, we now determine whether the evidence was sufficient to justify Sahhar's commitment.

■ B. Reviewing the evidence in the light most favorable to the government, we must decide whether a rational trier of fact, applying the clear and convincing standard of proof, could have found Sahhar to be dangerous. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Here, the district court received ample evidence demonstrating that Sahhar posed a substantial risk of causing future harm. During his period of evaluation and treatment from November 1987 until October 1988, Sahhar verbally and physically threatened staff members and other inmates, had to be physically restrained on at least one occasion, damaged at least three cells in which he was housed and physically assaulted a psychiatrist by approaching her from behind and squeezing her neck. Each of these acts occurred within a year of his commitment, and each clearly indicates the potential for risk to persons and property.

The government also presented testimony and reports from two mental health professionals who had treated Sahhar, Drs. Butts and Hetzel, who concluded that Sahhar was a paranoid schizophrenic and would continue to exhibit aggressive behavior. Their findings are consistent with evidence of nearly a decade of violent, antisocial behavior by defendant: Defendant repeatedly has had trouble controlling his temper, and has on numerous occasions manifested his emotions in aggressive behavior. "It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a [dangerous] act is likely to remain ill and in need of treatment." *Jones,* 463 U.S. at 366, 103 S.Ct. at 3050; *see also Clark,* 617 F.2d at 186. We therefore conclude that the district court's finding that defendant posed a substantial risk of bodily injury and serious property damage was supported by substantial evidence.

## VI

The judgment of the district court is affirmed in its entirety.

D.W. NELSON, Circuit Judge, dissenting.

I respectfully dissent.

The majority holds that appellant had no right to a jury trial under the sixth amendment. I agree. I disagree, however, with its rejection of Sahhar's claim that 18 U.S.C. section 4246 violates his right to equal protection.[1] The procedures prescribed for the involuntary commitment of

---

1. The majority asserts that it is internally inconsistent to find an equal protection violation but no sixth amendment violation. *See* Footnote 10, majority opinion. The focus of the two analyses, however, is quite different.

The sixth amendment does not attach here because the commitment proceeding is not criminal in nature. Perhaps the outcome (no right to jury trial in a federal criminal defendant's commitment proceeding; right to jury trial in ordinary criminal trial of a federal criminal defendant) implies that the sixth amendment distinguishes between two similarly situated groups. However, sixth amendment analysis itself does not make such a distinction, as the majority contends. Under sixth amendment analysis, a jury trial right is simply inapplicable because the proceeding at issue is non-criminal,

not because of any comparison between two similarly situated groups of defendants.

In contrast, comparison of the treatment of two similarly situated groups is the touchstone of equal protection analysis. Under the heightened scrutiny standard, the differential treatment afforded defendants like Sahhar will only be deemed constitutional if it is substantially related to an important government interest. Unlike under the sixth amendment, an equal protection claim does not hinge on the particular type of proceeding at issue. Instead, it depends on whether any differential treatment is warranted. Thus, it would not be inconsistent to find a violation of one but not the other, as the majority contends, since the linchpin of each one's analysis is entirely different.

individuals charged with federal crimes are not, in my opinion, substantially related to an important government interest and thus violate Sahhar's rights under the equal protection component of the due process clause of the fifth amendment.

## Equal Protection

### I. Level of Scrutiny

Neither the Supreme Court nor the Ninth Circuit has ruled expressly on the level of scrutiny which is appropriate for classifications affecting involuntary commitment. However, in *Hickey v. Morris,* 722 F.2d 543, 546 (9th Cir.1983), the court noted that *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), and *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), suggest that the "heightened rational basis test" is appropriate. The *Hickey* panel declined to decide the issue, however, since in that case "the challenged classifications survive[d] even heightened scrutiny."[2] 722 F.2d at 546.

I agree that heightened scrutiny is suggested by *Jackson, Baxstrom* and *Humphrey.* Applying the rational basis test to 18 U.S.C. section 4246 would be totally inappropriate, moreover, in light of the threat to individual liberty that it creates. A statute which allows an individual to be committed permanently and involuntarily to the custody of the Attorney General should not be subject to a level of scrutiny which is, as the majority notes, "more or less a judicial rubber stamp."

The majority does not decide this issue holding that this statute, like the one in *Hickey,* is constitutional under either a rational basis or a heightened scrutiny standard. Because I do not believe that the statute satisfies the heightened rational basis test, I feel that it is necessary to reach this issue and apply heightened scrutiny.

**2.** The district court had applied the heightened scrunity test, and the panel noted its agreement with that approach. *Hickey,* 722 F.2d at 546.

**3.** *See infra* note 4.

**4.** After an individual is committed to the custody of the Attorney General, there is no provision

### II. Analytical considerations

The majority notes that *Baxstrom* and *Jackson* provide some support for appellant's position but points out that 18 U.S.C. section 4246 differs from the commitment statute at issue in *Jackson* by requiring a finding of dangerousness by clear and convincing evidence. In my opinion, however, this additional provision does not remove the statute's constitutional infirmity. The point is not that commitment is predicated on an independent showing of dangerousness, but that involuntary lifetime commitment is possible under the statute with limited review[3] and without the procedural safeguards of a jury trial to which other individuals charged with a federal crime are entitled.

Federal criminal defendants have the right to a jury trial when threatened with six months or more of imprisonment. *Codispoti v. Pennsylvania,* 418 U.S. 506, 512, 94 S.Ct. 2687, 2691, 41 L.Ed.2d 912 (1974). Within this class of federal criminal defendants is a subclass suspected of being dangerous by virtue of mental disease. Under 18 U.S.C. section 4246, this subclass *alone* is denied the right to a jury trial even though a judicial determination of dangerousness can result in involuntary, lifetime commitment with no automatic, periodic review in which its members can themselves participate.[4]

To survive an equal protection challenge under the applicable heightened scrutiny standard, the differential treatment afforded Sahhar and those similarly situated must be substantially related to an important government interest. According to the majority, that interest is twofold: (1) the protection of society from "dangerous criminal defendants," and (2) the control and treatment of dangerous persons within the federal justice system.

for automatic, periodic review of the commitment decision. A discharge hearing may be requested by the government or the defendant may make a motion to that effect, but the court is under no obligation to hold such a hearing. *See* 18 U.S.C. §§ 4246(e), 4247(h).

I do not dispute that "Congress has a substantial interest in enacting legislation targeting those accused of federal crimes." I also appreciate the government's need to protect its citizens from dangerous criminals. I cannot agree, however, that these interests are substantially related to a statutory classification which denies a jury trial to federal criminal defendants facing involuntary commitment based on the suspicion that they have a mental defect rendering them dangerous. Denying a criminal defendant the right to a jury determination of dangerousness does not make our streets safer; it merely compromises the procedural integrity of the judicial system.[5]

The instant case is likewise distinguishable from *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), on which the majority relies, which held that jury trials are not constitutionally required in juvenile proceedings. *McKeiver* did not address the issue of equal protection. From the standpoint of equal protection, the government's interest in withholding a jury trial is much clearer in the case of juveniles. As the Supreme Court noted, requiring jury trials in juvenile proceedings would "put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." *McKeiver*, 403 U.S. at 545, 91 S.Ct. at 1986. There is no such idealistic prospect at work with respect to individuals such as Sahhar. In the instant case, the government's interest is not to decriminalize the process for humanitarian reasons, as in *McKeiver*, but rather, as the majority notes, to protect society from dangerous criminals. Denying jury trials is simply not substantially related to this interest.[6]

### III. Conclusion

Because I believe that 18 U.S.C. section 4246 violates appellant's right to equal protection of the laws under the fifth amendment, I would reverse the district court and hold the statute unconstitutional. I cannot conclude that the statute's creation of a class of federal criminal defendants who may be committed for life without the benefit of jury review simply because they are suspected of having a mental disease rendering them dangerous is substantially related to the government's interest in protecting its citizens from "dangerous criminal defendants." A statute which compromises an individual's equal protection right to a jury trial when his liberty may be permanently sacrificed cannot pass constitutional muster on the basis of the government's concern that he *may* be a mentally ill, dangerous criminal.

---

5. The situation arguably would be different if the defendant had been found guilty of the crime. *See Jones v. United States,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). This, however, is not the case.

6. It is important to note additionally that the potential deprivation of liberty faced by individuals such as Sahhar is far greater than that faced by juvenile defendants. Sahhar faces the possibility of involuntary commitment for life. In such circumstances, we should be loathe to deny any procedural due process safeguard.