[No. 29705-8-I.    Division One.    July 11, 1994.]

*In the Matter of the Detention of* P.S., SETH COHEN, ET
AL, *Petitioners,* P.S., *Appellant.*

*Suzanne Lee Elliott* of *Washington Appellate Defender Association,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Terrence James Ryan, Assistant,* for respondent.

WEBSTER, C.J. — P.S. appeals from two consecutive orders entered in Snohomish County Superior Court committing him for 180 days each to the Special Commitment Center (SCC) in Monroe, WA. P.S. has also filed a Personal Restraint Petition (PRP) in which he raises issues relating to an earlier commitment ordered by the Spokane County Superior Court. We have consolidated the petition and appeal for purposes of review.

FACTS

Dismissal of Felony Charges in Franklin County: On September 22, 1989, P.S. was charged in Franklin County with one count of second degree rape. He was committed to Eastern State Hospital (ESH), an evaluation and treatment facility designated by the Department of Social and Health Services, for a competency evaluation. P.S., 28 years old and with an IQ of about 47, was determined to be incompetent to stand trial. Accordingly, on April 12, 1990, the court dis-

missed the rape charge against P.S. pursuant to the incompetency provisions of the criminal insanity law, RCW 10.77.090.

First 180-Day Commitment Ordered by Spokane Court: Dr. Johnson, the M.D. in charge at ESH, filed a petition for 180-day commitment to ESH. On April 18, a Spokane County court commissioner found that P.S. was in custody pursuant to RCW 71.05.280(3) and that, as a result of mental disorder, he presented a likelihood of repeating similar acts.

Second 180-Day Commitment Ordered by Spokane Court: On October 8, 1990, Dr. Johnson filed a second petition for 180-day commitment stating that P.S. was incompetent, that P.S. had threatened, attempted to inflict or had inflicted physical harm on others, and as a result of a mental defect presented a likelihood of serious harm to others and continued to be gravely disabled. On November 2, a jury, in response to interrogatories, found P.S. had a mental disorder and was gravely disabled under RCW 71.05.320(2)(d).

Third 180-Day Commitment Ordered by Spokane Court: On April 24, 1991, Dr. Johnson filed a third petition for 180-day commitment alleging P.S. was in custody because he had a mental disorder and had committed acts constituting a felony. On April 29, a Spokane County court commissioner found P.S. to be gravely disabled under RCW 71.05.320(2)(d).

Transfer to SCC: On July 25, 1991, the director of the Developmentally Disabled Offenders Program (DDOP) at ESH filed a recommendation that P.S. be transferred from the hospital to the SCC. On July 26, a Spokane County court commissioner ordered P.S. transferred there.

Fourth Overall 180-Day Commitment and First Entered in Snohomish County: On October 17, 1991, Paul Murphy, an SCC mental health professional, and Dr. Seth Cohen, an SCC physician, filed a petition in Snohomish County Superior Court alleging that P.S. met all four criteria under RCW 71.05.320(2) for civil commitment. Prior to trial, defense counsel moved to dismiss the RCW 71.05.320(2)(c) allegation that P.S. had committed a felony on the grounds that it was

unsubstantiated. The court overruled the motion finding that P.S. would have appealed the initial, April 1990, Spokane commitment order if there had been an insufficient basis to conclude that he had committed a felony. The defense also objected to jury instruction 5 which stated the same; the court overruled the objection, declaring the issue of P.S's commitment of acts constituting a felony res judicata. On December 4, the court's order authorized further detention, finding that P.S. was gravely disabled, had committed a felony and posed a likelihood of repeating similar acts, and while under court-ordered treatment had attempted to harm another or others or property, and presented a likelihood of harm to himself or others, under RCW 71.05.320(2)(a), (c) and (d). P.S. appealed from this order.

Second 180-Day Commitment Ordered by Snohomish County: On May 13, 1992, Dr. Julia Moore and Lea Keylon, Master of Social Work, filed a petition alleging all four RCW 71.05.320(2) criteria for commitment. Defense counsel again moved to dismiss the allegation that P.S. had committed a felony. The court ruled the issue foreclosed by the findings at the fourth commitment trial. Counsel renewed this motion at the close of trial; the court again refused. The jury returned a verdict authorizing further detention. P.S. appealed.

On March 15, 1993, the State initiated further civil commitment proceedings. P.S. sought and was granted a stay of those proceedings pending the outcome of this PRP and appeal.

PERSONAL RESTRAINT PETITION

█ P.S. is no longer detained pursuant to any action taken by the Spokane County Superior Court which originally committed him. Thus, RAP 16.4 precludes P.S. from directly challenging that decision. RAP 16.4 provides:

(a) . . . [T]he appellate court will grant appropriate relief to a petitioner if the petitioner is under a "restraint" as defined in section (b) and the petitioner's restraint is unlawful . . ..

(b) . . . A petitioner is under a "restraint" if the petitioner has limited freedom *because of a court decision in a civil or criminal proceeding*, the petitioner is confined, the petitioner is

subject to imminent confinement, or the petitioner is under some other disability resulting from a judgment or sentence in a criminal case.

(Italics ours.) P.S. is presently under a "restraint" at the SCC pursuant to decisions flowing from proceedings that took place in Snohomish County courts.[1] Even if P.S. could challenge the Spokane commitment decision directly, the result would be the same here because there was sufficient new evidence to justify each of the Snohomish County court decisions. See parts II, III, *infra*. Thus, P.S. is not entitled to relief on his PRP issues.

## DIRECT APPEAL

### I

P.S. claims that because the Spokane court's April 18, 1990, commitment was invalid, the Snohomish court erred at the fourth and fifth commitment hearings in instructing the jury that P.S. "was taken into custody as a result of being charged with a felony, that he was determined to be incompetent to stand trial on those criminal charges, and that he had committed acts constituting a felony". P.S. argues that because the Spokane court never proved these matters, the Snohomish court should not have relied on its findings.

As above, P.S. cannot directly challenge the Spokane court's order. To the extent he can challenge it indirectly, the Snohomish courts did not err. The statute governing P.S.'s recommitments, RCW 71.05.320(2), is written in the alternative; thus, satisfaction of any subsection, (a), (b), (c), or (d), is sufficient to support confinement for further treatment. P.S.'s initial commitment by the Spokane court was pursuant to RCW 71.05.320(2)(c). The jury verdict in the first Snohomish County court commitment was based on subsections (a), (c) and (d). Thus, this commitment can be upheld because it was based, among other grounds, on subsection

---

[1]Midway through his third 180-day commitment, P.S. was transferred from ESH to the SCC, in Snohomish County. Thus, venue was transferred to Snohomish County. Following trials in Snohomish County courts, P.S. was committed for fourth and fifth 180-day periods, in December 1991 and May 1992 respectively.

(a), an alternative not used by the Spokane court, and supported by new evidence in the record. See discussion accompanying part II, *infra*. The jury in the second Snohomish County trial determined that P.S. should be recommitted under subsections (c) and (d). This finding was also well supported by new evidence in the record. See discussion accompanying part II, *infra*.

■ We find that the Franklin County court did prove sufficiently that P.S. was incompetent to stand trial. The court's order dismissing the charge against P.S. was accompanied by a 2-page letter from the ESH competency/evaluation and treatment program finding that P.S. lacks "the capacity to understand the proceedings against him and *is unable* to assist his attorney in his own defense on his charge". The treatment team attached a list of the criteria it used to evaluate competency. We also find that the Spokane court did not err in using a preprinted findings-of-fact form. We distinguish *In re LaBelle*, 107 Wn.2d 196, 218-19, 728 P.2d 138 (1986). There, nothing indicated the factual bases for the court's conclusions, while here the findings incorporate by reference the allegations in Dr. Johnson's supporting petition, which provide sufficient uncontradicted evidence to support the court's finding that P.S. had committed rape, an act constituting a felony. We find no error here.

## II

P.S. claims that his continued detention at the SCC is unconstitutional because the State failed to establish a recent overt act necessary for proof of danger to himself or others. By the fifth commitment proceeding, he asserts, the most recent "act" evincing dangerousness was the 1989 second degree rape allegation.

■ In considering whether an overt act evidencing dangerousness satisfies the recentness requirement, it is appropriate to consider the time span in the context of all surrounding relevant circumstances. *In re Pugh*, 68 Wn. App. 687, 696, 845 P.2d 1034, *review denied*, 122 Wn.2d 1018 (1993). The *Pugh* court stated:

The absence of overt acts in the last 5 years might be sufficient to discount the diagnosis and prediction of dangerousness were Pugh then living in the typical community. Pugh, however, has been institutionalized since 1986; isolated from children toward whom he has a predilection to cause harm. The absence of more recent overt acts during confinement is readily explainable as a lack of opportunity to offend rather than a demonstration of improvement so as to negate the showing that he presents a substantial risk of physical harm. We are satisfied that his earlier offenses resulting in convictions when considered with his confinement and current diagnosis satisfy the requirement that his future dangerousness be evidenced by a recent overt act.

*Pugh*, at 696.[2]

Similarly, P.S. has not had an opportunity to reoffend. P.S. has been out of the community since 1989, and while he does spend time engaging in recreational activities with peers, this time is closely supervised. Moreover, the affidavits and testimony at his two most recent trials established that his condition has not changed such that he would no longer reoffend.

At his fourth commitment trial, Dr. Cohen testified that P.S. had a mental disorder, was gravely disabled, and should remain at the SCC. He submitted a report with the petition for P.S.'s fourth commitment recommending against any changes in P.S.'s treatment program, noting that P.S. has been charged several times with second degree rape (once within 24 hours of release from detention) as well as arson and that there was a suggestion of pedophilic acts. He stated that P.S.'s behavior was noted to be periodically impulsive with outbursts, low frustration tolerance and inappropriate modeling of other patients' negative behaviors. In an affidavit jointly authored by Cohen and Paul Murphy, also submitted with the fourth commitment petition, they stated that P.S. had a history of sexual assault toward defenseless developmentally disabled peers and children while living in the community. They found P.S.'s judgment impaired as a

---

[2]*See also United States v. Sahhar*, 917 F.2d 1197, 1207 (9th Cir. 1990), *cert. denied*, 499 U.S. 963 (1991) (finding of substantial risk of bodily injury or serious property damage may be based on any activity that displays a genuine possibility of future harm to persons or property; whether that activity occurred recently is but one factor for the district court to consider in weighing the evidence).

result of moderate mental retardation and mixed personality disorder (impulsive sexual behavior, emotional volatility). They found that P.S. presented a high risk for reoffense in a nonsecure setting. They concluded that P.S. required specialized treatment in a secure setting to address his deviant sexual behaviors and assaultiveness in a manner compatible with his cognitive limitations and to prevent reoffense.

At P.S.'s fifth commitment hearing, Dr. Moore testified that P.S. had pedophilia and sexual aggression problems and that there was a great likelihood that P.S. would reoffend. In the petition she coauthored with Lea Keylon for the fifth commitment, they stated that P.S.'s understanding of his sexual and aggressive problems was very limited, and he avoids problems by leaving the scene rather than by asserting himself or coping with his impulses. They also noted that P.S.'s history indicated no ability to modify his behavior based on imposed consequences, *i.e.*, incarceration, and that his frustration continued to result in verbal abuse, property damage and physical assault. They wrote that P.S. had poor volitional control of his anger, and that he had manifested assaultive behavior during treatment at ESH and at SCC, requiring seclusion, restraint, and medication. His most recent commitment was marked by property destruction and verbal threats toward staff and peers, they attested. They concluded that P.S. presented a high risk for reoffense in nonsecure settings.

We find that ample evidence supported P.S.'s continued commitment.

### III

P.S. claims that it is a violation of RCW 71.05 and the constitution to detain him in a prison when he was committed civilly. We find his arguments without merit. He argues that RCW 71.05.020(17) forbids the placement of an evaluation and treatment facility in a "correctional institution or facility, or jail".

RCW 71.05.020(17) states:

"Evaluation and treatment facility" means any facility which can provide directly, or by direct arrangement with other public

or private agencies, emergency evaluation and treatment, outpatient care, and short term inpatient care to persons suffering from a mental disorder, and which is certified as such by the department of social and health services: PROVIDED, That a physically separate and separately operated portion of a state hospital may be designated as an evaluation and treatment facility: PROVIDED FURTHER, That a facility which is part of, or operated by, the department of social and health services or any federal agency will not require certification: AND PROVIDED FURTHER, That no correctional institution or facility, or jail, *shall be* an evaluation and treatment facility within the meaning of this chapter[.]

(Italics ours.) A closer reading of this statute reveals that it does not prohibit *placement* of a separate treatment facility in a correctional institution; rather, it indicates that a correctional facility *cannot be* the treatment facility. RCW 71.05.020(17). Thus, while P.S. is detained at the SCC, a separate facility at Twin Rivers, he is not detained in a correctional institution, facility or jail. The SCC, a mental health treatment facility, includes the DDOP.[3] The SCC is operated by the Department of Social and Health Services, and not the Department of Corrections. The DDOP is a new treatment program designed for developmentally disabled persons who have a history of dangerous behavior; it was specifically authorized by the Legislature. RCW 71.05.035.[4] Paul Murphy testified that the SCC was built as a secure mental health facility, specifically for persons like P.S. who are developmentally disabled but dangerous and who have not responded to previous treatment settings and show a likelihood of reoffense. It provides external supervision to protect the public, internal supervision to protect peers, and

---

[3] It also includes the program for sexual predators. However, these persons are physically separated and separately supervised.

[4] In pertinent part, RCW 71.05.035 states: "[T]he legislature believes that, where appropriate, and subject to available funds, persons with developmental disabilities who have been charged with felony crimes and have been found incompetent to stand trial or not guilty by reason of insanity should receive state services addressing their needs, that such services must be provided in conformance with an individual habilitation plan, and that their initial treatment should be separate and discrete from treatment for persons involved in any other treatment or habilitation program in a manner consistent with the needs of public safety." Enacted by Laws of 1989, ch. 420, § 2, effective May 13, 1989.

provides treatment. P.S.'s rights are not violated by his detention at the SCC.

## IV

P.S. claims that the State may not require him to admit he has committed acts constituting a crime in order to be released to a less restrictive facility. He asserts Moore will not release him to a less restrictive placement unless he admits to acts constituting a felony, violating RCW 71.05.200(1)(c) and his Fifth Amendment rights.

■ RCW 71.05.200(1)(c) states that a "person has the right to remain silent and that any statement he or she makes may be used against him or her". Similarly, the Fifth Amendment's privilege against self-incrimination applies to a civil detainee. *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 617 (9th Cir. 1973) (citing *In re Gault*, 387 U.S. 1, 47-48, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967)).

To support his proposition, P.S. cites distinguishable case law. *State v. Imlay*, 249 Mont. 82, 813 P.2d 979 (1991) involved a convicted defendant who refused to admit his sex offense and, therefore, was denied entry into a sex offender treatment program, which was a condition for a suspended sentence. *Imlay*, at 83. The Montana Supreme Court held that the defendant could not be required to admit a crime as a condition of his sentence in light of the Fifth Amendment. *Imlay*, at 91. Noting the split of authorities on this issue, the court stated that it was clear there that the defendant's incarceration was directly related to his refusal to admit his commission of the crime.[5] The same cannot be said here. P.S.'s failure to admit to a crime is not the reason for his continued commitment.

---

[5]The majority of courts follow the Fifth Circuit's holding in *Thomas v. United States*, 368 F.2d 941 (5th Cir. 1966), that such circumstances violate the defendant's Fifth Amendment rights. The court noted that the only federal circuit that had arrived at a contrary conclusion was the Ninth Circuit, which did so in *Gollaher v. United States*, 419 F.2d 520 (9th Cir.), *cert. denied*, 396 U.S. 960 (1969), where the defendant was given a stiffer sentence because of his refusal to admit guilt after he was convicted. The Ninth Circuit seemed to place greater importance on the criminal justice system's objective of rehabilitation than on the defendant's continued right to deny guilt. *Gollaher*, at 530-31.

The issue in the cases P.S. cites is not present here. Moore did not state she would not release P.S. to a less restrictive environment unless he admits to acts constituting a felony. On cross examination, she was asked "what is going to happen before you would indicate that [P.S.] was not dangerous in the community?" In a lengthy response, Moore began by responding that she would

> expect him, first of all, to admit that he has had sexual and aggressive problems. . . . Then I would look to comments from the staff of — staff that work with him on a 24-hour basis, as well as his therapist, to see how he limits his contact with children . . . with peers . . ..
>
> But because, after all, we're talking about sexual behaviors that are really aggressive acts rather than mere sexual pleasure. So we have to really evaluate his aggressiveness. So in other words, we look for how — what his cognitive and emotional problem-solving abilities are and how he demonstrates these in day-to-day living situations on the unit.
>
> And then my understanding is that there are graduated exposures to situations outside the center before a person with these problems is discharged to a less restrictive setting.

Defense counsel persisted in this line of questioning and eventually asked Moore, "is [P.S.] going to have to admit that he forced Ken into it, to having sexual intercourse?" to which Moore responded, "Yes. I think that is what he is going to have to admit. Whatever the particular details are." But when asked whether she was sure the incident had occurred, she responded, "I'm not sure at this point . . .. But in talking to him, you would get some kind of clues about what happened, too. When I talk with [P.S.] about these various incidents, first of all, he denied all of them to me". She added that she would advise P.S. of his right to remain silent before performing an evaluation of him.

Taken as a whole, it is stretching it to characterize Moore's testimony as standing for the proposition that Moore refuses to release P.S. unless he admits to acts constituting a felony. Her testimony appears to reflect that her chief concern is with P.S.'s potential danger to the community and that his admission or denial of prior felonies is one of many factors used to evaluate P.S.'s ability to function appropriately in a less re-

strictive environment. In any event, Moore does not have ultimate authority to release P.S. to a less restrictive placement; that must be done by a court.

We affirm.

PEKELIS and KENNEDY, JJ., concur.

Review denied at 125 Wn.2d 1015 (1995).