**UNITED STATES of America, Petitioner,**

v.

**George CHAIRSE, Respondent.**

Civil No. 98–1342.

United States District Court,
D. Minnesota.

Aug. 17, 1998.

Joan Humes, Asst. U.S. Atty., U.S. Attorney's Office, Minneapolis, MN, for Petitioner.

Robert Richman, Asst. Federal Public Defender, Federal Public Defender's Office, Minneapolis, MN, for Respondent.

### ORDER

KYLE, District Judge.

Before the Court are the Objections of the United States to the July 14, 1998 Report and Recommendation ( R & R ) of Magistrate Judge John M. Mason. In that R & R Judge Mason, after conducting a hearing on June 25, 1998 at FMC–Rochester, concluded that (1) Petitioner has not met its burden of presenting clear and convincing evidence that Respondent is suffering from a mental disease or defect as a result of which his release would create a substantial risk of danger to other persons or property of another, and (2) Petitioner has not substantiated that no suitable state facilities are available. Accordingly, it has been recommended to this Court that the Petition be denied which would have the effect of releasing Petitioner from FMC–Rochester subject to the terms of his supervised release which were imposed in connection with his July 29, 1994 39–month sentence for pleading guilty to being a felon in possession of a firearm. The Objections are supported by a Memorandum and Respondent has also filed a Memorandum in Support of the R & R.

The Court has conducted the required *de novo* review of the R & R and the Objections thereto, which has included a review of the transcript of the June 25th hearing. Judge Mason's R & R is thorough and well-reasoned and in the view of this Court, fully supported legally and factually. As Judge Mason candidly acknowledges in his R & R, this is a "close case." But a close case does not satisfy the "clear and convincing evidence" standard. Judge Mason did find that Respondent is suffering from a mental disease or defect, but also concluded that Petitioner has failed to meet its burden of demonstrating by clear and convincing evidence

that Respondent, if released, would pose a substantial danger. For the reasons articulated by Judge Mason, this Court reaches the same result. In addition, the Court adopts Judge Mason's determination that Petitioner failed to establish the absence of a suitable state facility

Accordingly, upon all the files, records, and proceedings herein, **IT IS ORDERED:**

1. The Objections (Doc. No. 7) are **OVERRULED;**

2. The R & R is **ADOPTED;** and

3. The Petition to Determine Present Mental Condition (Doc. No. 1) is **DENIED** and said Petition is **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

MASON, United States Magistrate Judge.

### REPORT AND RECOMMENDATION

#### INTRODUCTION

Respondent is serving a 39–month sentence for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He is presently under in-patient care, and housed in seclusion at the Federal Medical Center in Rochester ("FMC–Rochester"). The Respondent's date of release was to have been May 19, 1998. However, on May 15, 1998, the Government filed a certificate pursuant to 18 U.S.C. § 4246(a), stating that his release would create a risk of danger [Docket No. 1]. The filing of such a certificate has the effect of keeping the Respondent in custody until resolution of the Petition, pursuant to the provisions of 18 U.S.C. § 4246(d). *See* 18 U.S.C. § 4246(a).

The Petition alleges that because Respondent suffers from a mental disease or defect that would create a substantial risk of bodily harm to others or serious damage to the property of another, the Respondent should not be released. The Petitioner requests an Order pursuant to 18 U.S.C. § 4246 committing the Respondent to the custody of the U.S. Attorney General for continued hospitalization and treatment until suitable state placement is found or until the release of the Respondent would no longer constitute a

substantial risk of bodily harm to others or serious damage to the property of others. The matter is before the undersigned for a Report and Recommendation to District Judge Richard H. Kyle, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B).

On June 25, 1998, a hearing was held at FMC–Rochester to determine whether the Respondent suffers from a mental disease or defect as a result of which his release would create a substantial risk of bodily harm to others or serious damage to the property of another. *See* 18 U.S.C. § 4246(d). Joan Humes, Esq., appeared on behalf of the United States of America; Robert Richman, Esq., appeared on behalf of George Chairse, who was personally present. The Court heard testimony from Dr. Christine Scronce, a psychologist, Dr. Arthur Tenenbaum, a psychiatrist, and Pamela Young, a clinical social worker. Ten exhibits were also received into evidence at the hearing.

## FINDINGS OF FACT/REPORT

### *Applicable Law*

"Section 4246 provides for the indefinite hospitalization of a person who is due for release but who, as the result of a mental illness, poses a significant danger to the general public." *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir.1997) (*citing United States v. Steil*, 916 F.2d 485, 487 (8th Cir.1990)). The provisions of 18 U.S.C. 4246 have withstood various constitutional attacks. *See United States v. Sahhar*, 56 F.3d 1026 (9th Cir.), *cert. denied*, 516 U.S. 952, 116 S.Ct. 400, 133 L.Ed.2d 320 (1995); *United States v. Sahhar*, 917 F.2d 1197 (9th Cir.1990).

■ Proceedings under 18 U.S.C. § 4246 are commenced when the director of a facility in which a person is hospitalized files a certificate with the clerk of court certifying that a person whose sentence is about to expire: (1) is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another" and (2) "suitable arrangements for State custody and care of the person are not available." 18 U.S.C. § 4246(a) [1]; *accord S.A.*, 129 F.3d at 998; *Sahhar*, 917 F.2d at 1200 (*quoting* 18 U.S.C. § 4246(a)). After the filing of the certificate, the court holds a hearing guided by the requirements of 18 U.S.C. § 4246(d). *S.A.*, 129 F.3d at 998; *accord Sahhar*, 917 F.2d at 1200. "[T]he purpose of the certificate is to stay the defendant's release pending completion of the procedures contained in section 4246." *United States v. Wheeler*, 744 F.Supp. 633, 636 (E.D.Pa.1990).

If the requirements of 18 U.S.C. § 4246(d) are met, the hospitalized person will remain in the custody of the United States even after the expiration of his or her sentence. That section provides in full:

"If, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such

1. 18 U.S.C. § 4246(a) provides in relevant part: "If the director of a facility in which a person is hospitalized certifies that a person whose sentence is about to expire, ... is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available, he shall transmit the certificate to the clerk of the court for the district in which the person is confined... The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. A certificate filed under this subsection shall stay the release of the person pending completion of the procedures contained in this section."

responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility, until-

(1) such a State will assume such responsibility; or

(2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another; whichever is earlier. The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment."

18 U.S.C. § 4246(d).

■ In sum, the requirements of 18 U.S.C. § 4246 mandate that the Government show the following factors: "(1) mental disease or defect; (2) dangerousness if released; and (3) no suitable state placement." *United States v. Ecker*, 30 F.3d 966, 970 (8th Cir.), *cert. denied*, 513 U.S. 1064, 115 S.Ct. 679, 130 L.Ed.2d 611 (1994); *S.A.*, 129 F.3d at 1000.

■ The Court recognizes that it is entrusted with " 'an awesome responsibility to the public to ensure that a clinical patient's release is safe.' " *S.A.*, 129 F.3d at 1000 (*quoting United States v. Bilyk*, 949 F.2d 259, 261 (8th Cir.1991)). We are also guided by the fact that the statute imposes a high standard of proof on the Government. It must prove that the Respondent will pose a "substantial" risk to society if released, and it must present "clear and convincing evidence" to support that conclusion. The conflicting factors influencing the decision concerning dangerousness in this case make resolution particularly difficult. In addition, there is little legal precedent to guide the Court concerning the question of the availability of a suitable state placement. We conclude that there is not clear and convincing evidence that the release of the Respondent would present a substantial risk to society, when considered in light of the safeguards which will be put in effect during the Respondent's release on probation. We also find that the Government has failed to substantiate that no suitable state placement is available. We therefore recommend that the Petition be denied.

### Factual History

The Respondent's documented history of mental illness began in August of 1992, when he was involuntarily committed in the state of Mississippi. The Respondent was committed after he had been exhibiting bizarre behaviors while serving time at a Mississippi state jail. The Respondent had been seen smearing feces in his hair, masturbating in front of others, urinating on the floor, beating his head against the wall and referring to himself as "King George." He also exhibited disruptive and threatening behavior, as well as a disorganized thought process. He was treated with medications during his involuntary commitment, which lasted approximately a month. The Respondent was then discharged to his brother's care.

The Respondent is presently incarcerated for the crime of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He pleaded guilty to the crime. On July 29, 1994, the Respondent was ordered to serve 39–months by the United States District Court for the Southern District of Mississippi, plus supervised release for a period of three years.

The Respondent was initially sent to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, for psychiatric evaluations. The examiners at the facility did not find that the Respondent suffered from a mental illness.

After Springfield, the Respondent was transferred to the Federal Correctional Institution in EI Reno, Oklahoma, which is a medium security level institution, for one year. The Respondent began his sentence at EI Reno in December of 1995. *See* Defendant's Ex. 2. The Respondent was then transferred to the Federal Correctional Institution in Texarkana, Texas, through a transfer order dated January 13, 1997. *See* Defendant's Ex. 1. The reason for the transfer was for "less security." *Id.* A memorandum from the Warden at EI Reno states that the reason for the transfer was the following: "Chairse is a low level inmate with in custody

and there is a consideration for decrease in custody. The unit team does not believe he requires the security provided by this facility." Defendant's Ex. 2. The memorandum also notes that the Respondent "has made a good adjustment. He has received only one incident report [for refusing an order], and receives good work reports." *Id.* At Texarkana, the Respondent was placed with the general population.

The Respondent's condition eventually decompensated at Texarkana. He exhibited disruptive, demanding, and delusional behavior, and also engaged in masturbation in front of others. *See* Gov't Ex. 10. The Respondent was then transferred to FMC–Rochester for treatment.

The Respondent was admitted to FMC–Rochester on April 17, 1997. *See* Gov't Ex. 8. He was placed in Special Housing. *Id.* The Respondent received numerous incident reports for "Threatening Bodily Harm and Refusing to Obey." *Id.* The Respondent was described as "belligerent and combative." *Id.* He would also masturbate while talking to female staff, defecate on the floor of his cell, and speak in a sexually provocative manner. *Id.* The Respondent's diagnosis at that time was bipolar I disorder, cocaine dependence, and antisocial personality disorder. *See* Gov't Ex. 2.

Progress notes dated from May 28, 1997, to July 25, 1997, generally describe the Respondent as pleasant, cooperative, calm, able to follow rules, and socializing easily with staff and peers. *See* Defendant Ex. 4. During this time, the Respondent was eventually housed in the Martin Wing, which is a semilocked ward. *Id.* Some movement is allowed, as well as some interaction with other inmates. The Martin Wing is meant to be a transitional ward for eventual transfer to the open institution. At one point, the Respondent was moved from the Martin Wing to the open unit. *Id.* On July 25, 1997, the notes state that the Respondent would be reviewed for discharge. *Id.*

After effective treatment with medication, the Respondent was eventually discharged from FMC–Rochester. In a discharge summary dated July 16, 1997, Dr. Arthur Tenenbaum, the Respondent's treating psychiatrist, noted that the Respondent was well oriented, and not suffering from hallucinations and delusions at that time. *See* Gov't Ex. 7. The Respondent, however, denied that he had HIV, and refused treatment for the condition. *Id.* The Respondent was sent back to Texarkana.

On April 30, 1998, the Respondent again arrived at FMC–Rochester from Texarkana. The move from Texarkana was an emergency transfer as a result of the Respondent's relapse, which was exhibited by psychotic and manic symptoms. It appeared that the Respondent had been refusing to take medications to treat his mental condition. Another reason for the move was that the Respondent was nearing his scheduled time for release, and the facilities at Texarkana were not equipped to perform risk assessments for mentally ill inmates due for release.

When the Respondent initially arrived the second time at FMC–Rochester, he was experiencing delusions, such as believing that the staff was trying to poison him, hearing the voice of God, seeing people coming out of the walls to kill him, and believing that he was a king. *See* Gov't. Ex. 2. He would also strip naked and masturbate when approached for interviewing. *Id.* He would make inappropriate sexual comments to female staff, as well as numerous threats to staff. *Id.* The Respondent would yell and kick and pound at his door. *Id.* The Respondent would keep his living space unsanitary, and had poor hygiene. *Id.* Due to the Respondent's disruptive behavior, he has been in seclusion since his arrival at FMC–Rochester for the second time.

## I. THE RESPONDENT IS SUFFERING FROM A MENTAL DISEASE OR DEFECT

At the June 25, 1998 hearing, a licensed clinical psychologist at FMC–Rochester, Dr. Christine A. Scronce, testified that the Respondent suffers from bipolar I disorder, which is a disorder of mood. In addition, the Respondent suffers from a number of other health problems. He has diabetes, HIV, and high blood pressure. He is not cooperative in receiving treatment for such

physical conditions. This includes when he in remission from his mental disorder and when he is not.

Dr. Scronce has a Ph.D. from Southern Illinois University in clinical psychology, which she obtained in 1993. She has experience in conducting forensic and psychological evaluations for the U.S. District Courts since 1993. At the time of the hearing, Dr. Scronce had been the Director of Forensics of FMC–Rochester since September of 1997. She was familiar with the Respondent's medical and central files.

Dr. Scronce testified that the Respondent's bipolar disorder is evidenced by the following behaviors, which are all symptoms of the disorder: agitation, pressured speech, delusions, a decreased need for sleep, an expression of ideas that are not connected, distractibility, hypersexuality, poor judgment, inappropriate behavior, obliviousness to consequences, and disruptive behavior. The Respondent's inappropriate behavior is demonstrated by his sexually explicit comments to female staff, and masturbating in front of the staff. Evidence of the Respondent's delusions includes his practice of referring to himself as "King George of ancient times," which demonstrates grandiose thinking. Other delusions include believing that the staff is trying to poison him, experiencing auditory hallucinations ("hearing voices"), and imagining that objects are coming out of the walls.

The primary feature of bipolar disorder primarily affects the mood of a person suffering from the disorder. Dr. Scronce testified that the Respondent's disturbance in mood is reflected in his irritability. The Respondent's irritability is reflected in the verbal threats, which are described below. Dr. Scronce also testified that the Respondent has no control over his mood. This is demonstrated by the Respondent's arrival at FMC–Rochester for the second time. When he initially arrived, he would scream in his cell for hours.

Dr. Scronce is also the Chair of the Risk Assessment Panel, a panel that assesses whether inmates who are due for release would pose a substantial risk of bodily injury to others or serious damage to the property of others as a result of a mental disease or defect. Dr. Scronce was one of four examiners of the Risk Assessment Panel who interviewed and examined the Respondent on May 8, 1998.

When the Risk Assessment Panel attempted to interview the Respondent, he began to make threats to the panel members, such as "I'm going to cut your throat and drink your blood." *See* Gov't Ex. 2. He was irritated and made irrelevant responses during the review. *Id.* The Risk Assessment Panel noted that treatment with medication had been effective in the past, but noted that recently, the Respondent had been noncompliant with taking medication. *Id.* The Risk Assessment Panel diagnosed the Respondent with bipolar I disorder (most recent episode manic, severe, with psychotic features), cocaine abuse, and antisocial personality disorder. *Id.* They also opined that the Respondent was not appropriate for release, as he would pose a danger to society.

At the time of the examination by the Risk Assessment Panel, the Respondent had only been at FMC–Rochester for about a week. During that period, the Respondent was experiencing a full blown episode of his disorder. Dr. Scronce further opined that the unpredictability of the Respondent's mood presented a continuing basis for housing him in seclusion.

Dr. Scronce also testified that the Respondent's condition changed after his initial discharge from FMC–Rochester in 1997. He was more stable at that point in time. The first time that the Respondent was at FMC–Rochester, Dr. Scronce opined that the Respondent's symptoms were in remission.

Dr. Scronce did note that an overall improvement has been seen in the Respondent from when he initially arrived at FMC–Rochester for the second time. She also noted that in June of 1998, the Respondent showed a few good days after taking his medication. The problem, however, is that the Respondent does not show stability in his condition due to his non-compliance with taking medication on a regular basis.

Dr. Tenenbaum, the Respondent's treating psychiatrist, also testified at the hearing.

He concurred with Dr. Scronce's diagnosis of bipolar disorder. Dr. Tenenbaum testified that the first time the Respondent was at FMC–Rochester, he was more jovial. The Respondent substantially complied with taking his medication at that time. Dr. Tenenbaum testified that the difference in Respondent from his first stay at FMC–Rochester was that he was more irritated during his second stay. Dr. Tenenbaum stated that he once saw the jovial side of the Respondent during his second stay, and he believed that the Respondent had taken his medication at that time.

The Respondent's failure to introduce any expert medical testimony at the hearing to contradict the diagnosis of bipolar disorder and other manifestations of the Respondent's mental condition lends further credence to the Court's conclusion that the Respondent suffers from such a mental disease or defect. *See Steil,* 916 F.2d at 488 (where mental health professionals found inmate to be mentally ill, the Eighth Circuit noted that "there is no medical opinion to the contrary in the record before us").

The Court is persuaded that the Respondent is suffering from a mental disease or defect based upon the medical testimony that was taken at the hearing. The next question to be addressed is whether there is clear and convincing evidence that the Respondent's mental disease or defect renders him dangerous.

## II. THE RELEASE OF RESPONDENT WOULD NOT CREATE A SUBSTANTIAL RISK OF BODILY INJURY TO OTHERS OR SERIOUS DAMAGE TO PROPERTY OF OTHERS

■ "Section 4246 is specifically designed to avert the public danger likely to ensue from the release of mentally ill and dangerous detainees." *S.A.,* 129 F.3d at 1000 (*citing United States v. Moses,* 106 F.3d 1273, 1280 (6th Cir.1997)). We do not find that the Petitioner has met this strict burden of proof, nor shown why the implementation of the conditions of the Respondent's supervised release will not have the effect of protecting society.

■ Under 18 U.S.C. § 4246(d), the Government must "prove dangerousness by clear and convincing evidence." *S.A.,* 129 F.3d at 1000 (*citing United States v. Evanoff,* 10 F.3d 559, 560 (8th Cir.1993)). In the context of commitment hearings, this requires "'something more serious than is demonstrated by idiosyncratic behavior.'" *Sahhar,* 917 F.2d at 1207–1208 (*citing Addington v. Texas,* 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). The behavior of the Respondent is clearly substantially more than idiosyncratic. We are not persuaded that his behavior demonstrates a risk of dangerousness.

Useful to the determination of whether the Respondent has been proved to be dangerous is to compare the matter at hand with other cases where the release of a respondent has been found to present a risk to society. In *S.A.,* 129 F.3d at 1000–1001, the respondent repeatedly assaulted others, destroyed property, experienced violent auditory and visual hallucinations, and wrote letters admitting his violent nature and threatening to commit future crimes. In *Sahhar,* 917 F.2d at 1207–1208, the respondent assaulted a psychiatrist, damaged at least three cells, and verbally and physically threatened others. In *Ecker,* 30 F.3d at 970 n. 7, the respondent had a history of actual violent conduct involving a serious assault and a conviction for arson, and he also wrote disturbing and threatening letters. In *United States v. Rivera,* 1994 WL 118542 *6 (N.D.Ill. April 6, 1994), the respondent had committed a violent act in the past, believed that his mother was the devil who was trying to make him commit evil acts, had no sense for the value of life, and had a preoccupation with suicide. In *United States v. Lewis,* 929 F.2d 440, 441 (8th Cir.1991), the respondent had a "long history of psychiatric illness and assaultive and aggressive behavior," with delusional and aggressive visual and auditory hallucinations. In *Steil,* 916 F.2d 485, there was no history of violent behavior and the only conviction was for possession of sawed-off shotgun, but the respondent wrote numerous threatening letters, he responded to hallucinations as if they are real, five mental health workers opined that he was dangerous, and no other

contrary evidence was presented showing that he was not dangerous.

Dr. Scronce opined that the Respondent would pose a risk of harm to others if released. Her opinion was based on the Respondent's history of substance abuse, history of aggressive behavior, and the diagnosis of his mental disorder. Dr. Scronce noted that the Respondent's bipolar condition, mania, and psychosis results in aggressive and violent behavior, as well as verbal threats. Dr. Scronce testified that the Respondent's mental condition was the source of his dangerousness. She noted that the Respondent has been in seclusion since his arrival in April of 1998 at FMC–Rochester due to his extreme agitation, irritability, and hostile nature. Dr. Scronce further believed that the Respondent also exhibited dangerous behavior during remission, in that he engaged in antisocial behavior, and expressed symptoms of mania and psychosis.

Dr. Scronce opined that the Respondent required in-patient placement, and that an open unit where he would be able to interact with other inmates was not appropriate. She further opined that a group home or community placement was not appropriate due to the Respondent's failure to comply with medication and treatment.

Dr. Tenenbaum fully agreed with Dr. Scronce's assessment that the release of Respondent would create a substantial risk of harm. He based his opinion on the Respondent's condition of bipolar disorder and his noncompliance with taking medication.

The Respondent points out that at Springfield in 1995, there was no finding of a mental illness. Dr. Scronce explained that the reason the examiners did not find a mental illness at that time was that they did not witness symptoms evincing mania or psychosis. The Respondent also denied any mental treatment to the examiners. Dr. Scronce explained that bipolar disorder is cyclical in nature and that Respondent's condition fluctuates. An individual suffering from the disease may be stable for a period of time, and then slip into remission. As an example, Dr. Scronce observed that the Respondent was discharged from FMC–Rochester in 1997, but then returned the following year. Dr.

Scronce also admitted that if Respondent had been scheduled for release in April of 1998 instead of May 1998, she would have been recommended that he be released since his condition was stable at that time. But Dr. Scronce further warned that over time, the cycles of the disorder can speed up, and the resulting mania can become more severe.

## A. Factors from United States v. Ecker

Factors for determining dangerousness have been suggested in United States v. Ecker, 30 F.3d 966, 970 (8th Cir.), cert. denied, 513 U.S. 1064, 115 S.Ct. 679, 130 L.Ed.2d 611 (1994). These factors include: "a history of dangerousness, a history of drug or alcohol use, identified potential targets, previous use of weapons, any recent incident manifesting dangerousness, and a history of problems taking prescribed medicines." Id. at 970. We find such factors useful in analyzing whether the Respondent is dangerous. This matter is made all the more difficult, as some of these factors weigh in favor of a finding of dangerousness, while others do not.

### 1. A History of Dangerousness

The Respondent has an extensive criminal history, which consists of numerous convictions for burglary, gambling, drugs, concealed weapons, and carrying a firearm as a felon. The Respondent served time in two "normal" prisons without major incident. The Respondent served time in EI Reno with only one incident for refusing an order. He was then transferred to Texarkana, the reason being that it was believed he needed less security. See Defendant's Ex. 1. There was no evidence of any physical violence at either prison, but the Petitioner points out that the Respondent has not had the opportunity to carry out an assault at FMC–Rochester, as he is restrained and or escorted when he leaves his cell.

The Court recognizes that "[o]vert acts of violence ... are not required to prove dangerousness." Ecker, 30 F.3d at 970. The record here, however, shows that although the Respondent verbally expresses generalized threats as a result of his mental disor-

der, he does not carry through with them, except that sometimes the Respondent has grabbed the hands of nurses when they passed food or medication to him in his cell. The Respondent's behavior can be characterized as rude and vulgar.

A review of the Respondent's disciplinary record shows that most of his citations are for threatening bodily harm and for refusing to obey orders. *See* Defendant's Ex. 5. Dr. Scronce also noted that numerous additional threats and sexual comments by the Respondent were not recorded.

Another point of concern for Dr. Scronce is the Respondent's hypersexuality in combination with his HIV status. She testified that the Respondent is extremely preoccupied with sex. This is manifested, among other things, in his conduct of masturbating in front of others and speaking in a sexually explicit manner to the female staff. Furthermore, the Respondent continues to deny that he is HIV positive. In combination with the symptoms of his mental disorder which results in poor judgment and a lack of awareness of consequences, Dr. Scronce believes there is a risk that he will infect others with the HIV virus. She also noted that the Respondent has had syphilis, which demonstrates that he has had unprotected sex in the past.

### 2. A History of Drug or Alcohol Use

Respondent has a history of substance abuse, particularly for cocaine, and possibly also for marijuana and alcohol. The Respondent has also been convicted several times for drug offenses. Dr. Scronce testified that abuse of drugs reduces judgment and impulse control. The Respondent has been incarcerated for almost four years. During that time, he has presumably not been exposed to illicit drugs.

### 3. Identified Potential Targets

In *Ecker*, the Court found that the identification of potential targets was relevant in determining dangerousness. 30 F.3d at 970. The respondents in *Ecker*, 30 F.3d at 970 n. 6, and *Steil*, 916 F.2d at 487, identified specific potential targets. Respondent's case can

be distinguished from *Ecker* and *Steil*, in that his treats are generalized.

### 4. Previous Use of Weapons

The Respondent has a history with weapons. The charge for which he is currently incarcerated is for being a felon carrying a concealed weapon. It had not shown at the hearing, however, that the Respondent has a history of using weapons against people.

### 5. Recent Incidents Manifesting Dangerousness

Dr. Scronce observed that the Respondent did not have a therapeutic release ("TR") during his second time of treatment at FMC–Rochester until June of 1998. Up until that time, the Respondent had not been stable enough to have a TR. Dr. Tenenbaum described an incident on June 11, 1998, where the Respondent was on a TR and made an escorted visit to Dr. Tenenbaum's office. The Respondent was initially pleasant. He was concerned about having some of his property returned to him. After the Respondent's request was denied, he began to yell threats. The Respondent also refused to leave the office. At one point, the Respondent stood up. Dr. Tenenbaum felt frightened and placed the telephone that was in front of the Respondent into a drawer, for fear that the Respondent would hurl it at him. Dr. Tenenbaum also felt that the Respondent came quite close to him. It took ten minutes to calm the Respondent.

The Court notes that during such a situation, the Respondent did not inflict any physical harm. It appeared that the Respondent had an opportunity to do so or attempt to do so, as Dr. Tenenbaum stated that they were standing face to face in close proximity.

Another incident was described at the hearing where the Respondent vocalized a threat to another inmate while he was in a restraining cage. He was heard stating that he would tear out the other inmate's heart when he got out of the cage. There was no evidence, however, that the Respondent physically attempted to carry out such a threat.

Dr. Scronce noted that the Respondent even made threats to the members of the Risk Assessment Panel during their determination of whether he could be safely released. Dr. Scronce stated that such conduct evidenced his poor judgment. She also gave an example of a threat made by the Respondent, which was something to the effect that they were "damn right" that he was dangerous, and that he would rip their heads off and drink their blood, and that he would use an ax to do so. At this time, the Respondent had recently arrived from Texarkana and was experiencing a full blown episode of his bipolar condition. Dr. Scronce testified that the Respondent's condition had improved since that time.

As against this behavior as noted, an examination of the most recent progress notes from May 25, 1998, to July 1, 1998, generally show that the Respondent acts appropriately, and is calm and cooperative. *See* Gov't Ex. 9. These notes are very comprehensive, as they denote the Respondent's behavior every few hours. *See id.* Very few incidents of disruptive outbursts or labile behavior was observed. *See id.* The Respondent also appeared to have no problems with sleep. *See id.* Furthermore, during such a period, the Respondent went out on a few TRs. *See id.* During the TRs, he was observed as getting along well with others, and was social with his peers. *See* Gov't Ex. 9. The Respondent was also observed as enjoying his time out on the TRs. *See id.* He does, however, continue to make inappropriate sexual comments and gestures to nurses, such as making kissing motions with his lips. *See id.* The notes also show that there are times when the Respondent complies with taking medication and times when he does not. *See id.*

### 6. A History of Problems with Prescribed Medication

On June 5, 1998, the Respondent gave his consent for administration of anti-psychotic and mood stabilizing medication. The Respondent currently takes gabepentin and seraquel. He had also provided consent for administration of medication during his first stay at FMC–Rochester.

It has been shown that the Respondent's condition can be stabilized with medication. There are times where the Respondent's condition can be controlled through medication, but the problem is that there is no stability due to the Respondent's failure to regularly comply with taking medication. Dr. Scronce testified that the Respondent's action of not taking medication leads to decompensation. Furthermore, she testified that without the medication, the Respondent's condition will become more severe. As for the Respondent's prognosis, Dr. Scronce testified that in the short-term, the outlook is favorable on the condition that the Respondent takes his medication.

A concern in this matter was the Respondent's failure to take his medication on a regular basis. The Respondent needs to be urged before he takes medication. A factor that aggravates the problem is that he does not believe he has a mental disorder, which Dr. Scronce testified is a manifestation of his mental condition, and further leads him to believe that medication is not necessary.

The Respondent has only shown sporadic compliance with taking medication in the past. In fact, the day of the hearing and the day prior, the Respondent had refused to take medication. The week prior to the hearing, the Respondent took psychotropic medication about fifty percent of the time. During Respondent's first stay at FMC–Rochester, he did take medication, and was eventually discharged. Another example of compliance is that he spent one year in a jail with the general population at Texarkana until he decompensated, from what appears to be a failure to take medication. The primary concern is that the Respondent will not take medication of his own accord if he is released.

### B. *Effect of Supervised Release*

Application of the *Ecker* factors render this a close case. Some factors weigh in favor of dangerousness, while others do not. The existence of the special conditions of supervisory release substantially affects the *Ecker* factors. Testimony was not offered to show that the conditions of supervisory re-

lease would not protect Respondent or society.

The principal concern of Petitioner, and the Court, is whether Respondent will take his prescribed medication. When he does so, Respondent is capable of controlling his actions, and acts in conformity with general rules. Upon his scheduled release, the Respondent intends to live with his brother in Mississippi. *See* Gov't Ex. 4, at 4. The release comes with many conditions, the most important of which are the following "special conditions" which were imposed as part of Respondent's sentence, to be followed after his release:

1) The defendant shall participate in a mental health aftercare program as directed by the U.S. Probation Officer, and undergo a complete psychiatric evaluation and take any prescribed medications, as directed by the U.S. Probation Officer.

2) The defendant shall participate in a drug/alcohol aftercare program as directed by the U.S. Probation Officer.

Exhibit A to Petition, at 3.

The danger which Petitioner foresees is based in part upon Respondent's poor record of compliance with the schedule of taking medications. Incarceration has not served as a sufficient inducement to cause Respondent to take his medication, even though this medication is believed needed to permit the Respondent to respond well to treatment. This concern is directly addressed in the conditions of his release.

If Respondent desires to maintain his freedom, it will be necessary for him to take all of his medication, and to accept the prescribed course of medical treatment. Failure to do so will result in his arrest, and being placed back in prison, since this would constitute a violation of the conditions of release. On the face of it, in the absence of any testimony to the contrary, the risk of danger is thus reduced either by the required compliance with the need to take medication, or by the reincarceration which will occur if Respondent does not do what is required of him.

The same analysis applies to the risk that Respondent will engage in the improper use of drugs or alcohol. While on release, he will be required to participate in a "drug/alcohol aftercare" program. *Id.* If he complies with this condition, the risk to society will be reduced. And if he fails to comply, he will be taken back to prison for violating a condition of release.

These conditions of release serve to reduce the risk to society, posed by the release of Respondent. The conditions provide an incentive for the Respondent to comply with such conditions, for only compliance will allow him to remain out of custody.

### C. ·Conclusion

Respondent is mentally ill and exhibits crude, inappropriate and bizarre behavior. After a consideration of the relevant legal factors for determining dangerousness, and balancing the implementation of the conditions of supervised release, we find that the Petitioner has failed to meet its burden of demonstrating by clear and convincing evidence that the Respondent will pose a substantial danger if released.

### III. THE PETITIONER HAS FAILED TO SHOW AN ABSENCE OF SUITABLE STATE PLACEMENT

Another requirement that the Government must fulfill under these commitment proceedings is to show an absence of a suitable state placement. 18 U.S.C. § 4246(a). The statute does not specifically address the duty of the Government under the statute. Case law, however, makes it clear that it is the Government's burden to show that there is no suitable state placement available. *Ecker,* 30 F.3d at 970 (the Government must meet its burden under 18 U.S.C. § 4246(a) to show there is "no suitable state placement"); *accord S.A.,* 129 F.3d at 1000.

▮▮▮▮ The Court recognizes that the statute is unclear about what steps must be taken by the Government to find suitable state placement. Section § 4246(a) merely provides that certification by the Attorney General stating that there are no suitable arrangements for state custody is required

before commitment proceedings may commence. 18 U .S.C. § 4246(a); *Wheeler*, 744 F.Supp. at 640. The reason for such a requirement is that it fulfills Congress' intent that 18 U.S.C. § 4246 be "used only in those rare circumstances where a person has no permanent residence or there are no State authorities willing to accept him for commitment." *Wheeler*, 744 F.Supp. at 640 (citations omitted); *accord United States v. Hicks*, 799 F.Supp. 1148, 1150 (S.D.FL.1992) (*citing Comp. Crime Control Act of 1984*, Pub.L. No. 98–473, 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3432). It is further noted that Congress' intent to limit the use of 18 U.S .C. § 4246 is due to the belief that care and treatment for the mentally ill is the function of the states rather than federal government. *Wheeler*, 744 F.Supp. at 640 (citations omitted); *accord Hicks*, 799 F.Supp. at 1150.

 The Government has a continuing duty to try to place an inmate in a state facility in the domicile of the imprisoned individual. *See Ecker*, 30 F.3d at 971. 18 U.S.C. § 4246(d) only provides that "[t]he Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility." *Ecker*, 30 F.3d at 971; *accord Sahhar*, 56 F.3d at 1030; *Hicks*, 799 F.Supp. at 1150; *Rivera*, 1994 WL 118542 *6; *Steil*, 916 F.2d at 488 (recognizing that state placement depends on finding a state institution willing to accept the inmate, and noting that the government has a continuing duty to place the inmate in a state institution).

The Petitioner contends that it has provided the proper certification. *See* Gov't Ex. 5. It has also inquired about state placement. It made telephone calls to possible facilities in the Respondent's home state of Mississippi, but Mississippi facilities would not accept the Respondent. The Petitioner also observes that no statutory language, case law or legislative history supports a finding that states may be compelled to accept inmates.

Pamela Young, a clinical social worker, testified on the issue of state placement.

Young's job responsibilities include seeking placement for mentally ill inmates by contacting an area where the inmate was tried for the offense for which he or she is incarcerated. Young contacted Mississippi about in-patient facilities [2] (Young also inquired about group homes, but Mississippi refused to consider the Respondent for such care after viewing his records). The state officials informed Young that there were no beds available for voluntary patients for in-patient facilities. A four- to five-week waiting period existed for involuntary or court-committed patients. The state would not place the Respondent in line on the waiting list, stating that a court order was first necessary before an involuntarily committed individual could be placed on the waiting list.

We recognize that the statute or legislative history [3] fails to shed light precisely on what efforts the Government is expected to make in fulfilling its burden under the statute, and what burden, if any, is on a State to show an absence of suitable state facilities. A waiting list exists in this case, which shows that state placement was a possibility, although not an immediate possibility. Had the State agreed to place Respondent on the waiting list, a place would have been available at the time of the June 25, 1998 hearing in this case. The State may now realize that it has an interest in the Respondent given the realization that he is to be released. *See United States v. Sahhar*, 56 F.3d 1026, 1030 (9th Cir.), *cert. denied*, 516 U.S. 952, 116 S.Ct. 400, 133 L.Ed.2d 320 (1995) (where federal government dismissed charges against a mentally ill inmate in federal custody, the case was remanded to determine whether "the statutory preference for the state's acceptance of custody can be effectuated" on the basis that the state "may see its interests quite differently now that it is clear the federal government does not intend to try [the respondent]").

### CONCLUSION

Petitioner has not met its burden of presenting clear and convincing evidence that

---

**2.** The record does not reveal the exact date on which Young initiated such calls. The calls were made prior to the filing of the May 15, 1998 certificate by the director certifying that no suitable state facilities were available.

**3.** *See Comprehensive Crime Control Act of 1984*, P.L. 98–473, S.Rep. No. 98–225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182.

the Respondent is suffering from a mental disease or defect as a result of which his release would create a substantial risk of danger to other persons or property of another. The Petitioner has also not substantiated that no suitable state facilities are available. Accordingly, it is recommended that the Petition be denied.

## RECOMMENDATION

For the foregoing reasons, and based upon all of the records, files and proceedings herein,

IT IS HEREBY RECOMMENDED THAT: the Petitioner's Petition to Determine Present Mental Condition of an Imprisoned Person Due for Release Under 18 U.S.C. § 4246 [Docket No. 1] be denied, and that the Court thus decline to issue an Order committing Respondent to the custody of the Attorney General for continued hospitalization and treatment.

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by **July 29, 1998**, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearings in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearings by **July 29, 1998**.